## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiff*,

*v.*

JONATHAN SKRMETTI, in his official capacity as the ATTORNEY GENERAL AND REPORTER OF THE STATE OF TENNESSEE;

*Defendant.*

No. _____

Judge: _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical manufacturers to "offer" their products at steeply discounted prices to an enumerated and clearly defined list of healthcare providers called "covered entities." 42 U.S.C. § 256(a)(1). Such price controls can disincentivize innovation and destabilize markets, and Congress carefully crafted Section 340B to limit participation in the program to fifteen—and only fifteen—types of covered entities. *Id.* § 256b(a)(4)(A)-(O). Congress further prohibited these covered entities from selling the discounted drugs to someone who was not a "patient of the entity," *id.* § 256(a)(5)(B), a practice commonly known as "diversion." Nor may a covered entity collect multiple price reductions, under both the 340B program and another federal program (like Medicaid), for a single drug sale, *id.* § 256(a)(5)(A), a practice known as "duplicate discounting."

2.     The costs to manufacturers of unlawful diversion and duplicate discounting are severe, and Congress did not leave covered entities free to police their own compliance with these

statutory prohibitions. Instead, to mitigate potential abuse, Congress granted drug manufacturers the right to audit a covered entity—at the manufacturer's own expense—if the entity is suspected of diverting drugs to non-patients or of obtaining duplicate discounts. Congress also required the Secretary of the Department of Health and Human Services (HHS) to establish an adjudicatory body to resolve disputes among participants in the 340B program, including claims by manufacturers that a covered entity is violating the statute.

3.     The Secretary of HHS, acting through its subagency the Health Resources and Services Administration (HRSA), has accordingly established requirements that a manufacturer must meet before it may audit a covered entity. Notably, a manufacturer must gain HRSA's permission before conducting an audit; and to obtain such permission, the manufacturer must satisfy HRSA that it has "documentation which indicates that there is reasonable cause" to "believe that a covered entity may have" diverted 340B-discounted drugs to non-patients or collected duplicate discounts. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). In practice, this means that a manufacturer must already have significant evidence that a covered entity is violating the 340B statute *before* it can get permission from HRSA to conduct an audit.

4.     The ability of manufacturers to audit covered entities for suspected diversion or duplicate discounting is especially critical because a manufacturer cannot use HRSA's dispute-resolution process without having first conducted an audit. HRSA's regulations allow a manufacturer to file a dispute-resolution claim only "after it has conducted an audit of a covered entity." 42 C.F.R. § 10.21(a)(2). And a manufacturer can recover for unlawful diversion or duplicate discounting *only* by filing (and winning) such a claim.

5.     In sum, a manufacturers can only recover against a covered entity for statutory violations through HRSA's administrative dispute-resolution process; can only use that

administrative process if it first conducts an audit; and can only conduct an audit if it proves to HRSA's satisfaction that it has sufficient documentation to establish reasonable cause that a covered entity is violating the 340B statute.

6.      The 340B program has grown exponentially in size in recent years, owing to the financial incentive that covered entities and others have to generate as many 340B sales as possible. Rather than sell 340B-discounted drugs directly, as they did originally, most covered entities now maximize their revenues by partnering with large for-profit pharmacy chains, commonly known as "contract pharmacies." These pharmacies sell drugs as usual to their customers at commercial prices, which are paid by the customer (in the form of an insurance copay) and his or her insurer (which pays the balance). But at some point after the sale has occurred—often weeks or months later—a consultant makes a judgment that the pharmacy's customer was a patient of the covered entity. At that point, the consultant places an order to "replenish" the pharmacy's inventory for the previously dispensed drug at 340B prices. The difference in price between the original sale (at the commercial price) and the replenishment sale (at the 340B discount) generates significant arbitrage revenue, which is split between the covered entity, the contract pharmacy, and the consultant.

7.      Use of this "replenishment" approach for sales at contract pharmacies has turned the 340B program into a cash cow, generating billions of dollars for covered entities and their for-profit pharmacy partners. At the same time, because of the profit motive to maximize the number of sales eligible for 340B discounts, the program has experienced a surge in abuse, which has been well documented by neutral observers such as the Governmental Accountability Office, congressional committees, and HHS's Office of the Inspector General. And left out of this goldrush are the very people whom Congress created the 340B program to help—patients—most of whom receive *no* discounts for sales at contract pharmacies.

8.      Concerned about the harms associated with unfettered contract pharmacy use, drug manufacturers like plaintiff AstraZeneca Pharmaceuticals LP responded in late 2020 by adopting policies designed to promote 340B program integrity. Under AstraZeneca's policy which launched in October 2020, a covered entity may make unlimited purchases of AstraZeneca's 340B-discounted products through the entity's in-house pharmacy; or if the entity lacks an in-house pharmacy, it may purchase unlimited numbers of 340B-priced drugs through a single contract pharmacy of its choosing. AstraZeneca's current policy also requires covered entities purchasing its 340B drugs to regularly submit minimal claims data, which allows AstraZeneca to identify anomalous purchasing behavior indicative of potential diversion or duplicate discounts. This data-collection policy also provides a covered entity with an opportunity to monitor purchases made on its behalf by its consultant, to ensure its own compliance with the 340B statute.

9.      HRSA and covered entities opposed such manufacturer policies. But multiple federal courts have now ruled that a participating manufacturer's obligation to "offer" discounts under the 340B program does *not* require a manufacturer to make 340B discounts available for sales at "an unlimited number of contract pharmacies." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 461 (D.C. Cir. 2024); *accord Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023). And the D.C. Circuit specifically upheld manufacturer policies requiring covered entities to provide claims data associated with 340B contract pharmacy orders, which the Court found to be an appropriate means of allowing manufacturers to prevent the improper diversion of their 340B-discounted medicines while imposing only "minimal" burdens on covered entities. *Novartis*, 102 F.4th at 463-64.

10.     Dissatisfied with the scope of federal law, on May 5, 2025, Tennessee enacted a statute seeking to achieve under state law precisely the same result that federal courts have

resoundingly rejected. Known as SB 1414, the law imposes several requirements on drug manufacturers who choose to participate in the federal 340B program.

11.    SB 1414 forbids a manufacturer from "either directly or indirectly, deny[ing], impos[ing] any restrictions or prohibitions on, discriminat[ing] against, or otherwise limit[ing] the acquisition of any 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity unless such receipt is prohibited by the United States department of health and human services or applicable state law." SB 1414 § 1(c). This provision is subject to a grandfather clause, which exempts any "requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." *Id.* AstraZeneca's one-pharmacy policy falls under the statute's grandfather clause.

12.    Yet SB 1414 *also* prohibits a manufacturer from requiring covered entities or contract pharmacies, as a condition on its offer to sell drugs at 340B discounts, to submit claims data regarding 340B purchases. SB 1414 § 1(a)(1). This claims-data restriction is *not* subject to any grandfather clause.

13.    SB 1414's claims-data restriction creates a conflict with, and thus is preempted by, federal law under the Supremacy Clause of the U.S. Constitution. *See* U.S. Const. art. VI, cl. 2. The D.C. Circuit has ruled that federal law permits a manufacturer to condition its "offer" of 340B-discoutned drugs on the submission of reasonable claims data regarding contract pharmacy purchases. *See Novartis*, 102 F.4th at 463-64. SB 1414 prevents manufacturers like AstraZeneca from collecting such data, which is necessary to identify and prevent instances of duplicate discounting and diversion. Without this data, AstraZeneca cannot exercise its statutory rights to

5

audit covered entities and file dispute-resolution claims—both key components of the 340B program, which Congress included to safeguard program integrity.

14.     Indeed, HRSA recently launched a pilot program under which manufacturers may condition their offer of 340B discounts on the same "readily available pharmacy claim" data that AstraZeneca's policy requires, but that SB 1414 forbids manufacturers to request. 90 Fed. Reg. 38,165, 38,167 (Aug. 7, 2025). SB 1414 thus prevents manufacturers, like AstraZeneca, from participating in this pilot program. But the Supremacy Clause does not permit a State to undermine the functioning of a federal program—especially not one, like the 340B program, that involves nationally uniform standards and exclusive enforcement by federal agencies.

15.     SB 1414 interferes with the operation of Section 340B in other respects as well. It prohibits manufacturers from imposing reasonable requirements related to inventory management, SB 1414 § 1(a)(3), even though the D.C. Circuit has affirmed the permissibility of such "historic practices under the 340B program," *Novartis*, 102 F.4th at 464.

16.     SB 1414 also prohibits manufacturers from imposing requirements related to "the frequency, duration, or scope of audits." SB 1414 § 1(a)(4). Yet the 340B statute expressly grants manufacturers a right to audit covered entities, 42 U.S.C. § 256b(a)(5)(C), and HRSA has promulgated extensive rules and guidelines pursuant to its exclusive authority over the audit process, *see, e.g.*, 61 Fed. Reg. 65,406, (Dec. 12, 1996). SB 1414 accordingly interferes with manufacturers' ability to exercise their statutory audit rights.

17.     AstraZeneca therefore seeks an order: (1) declaring that SB 1414 is preempted by Section 340B and (2) enjoining Defendant Tennessee Attorney General Jonathan Skrmetti and any other Tennessee officials from enforcing SB 1414 against AstraZeneca through investigative

demands, administrative proceedings, lawsuits seeking civil penalties or other relief, or in any other manner.

## JURISDICTION AND VENUE

18.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the Constitution of the United States) and 28 U.S.C. § 1338(a) (civil action arising under any Act of Congress relating to patents). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02.

19.      This Court also has inherent equitable powers to enjoin actions of state officials that contradict the federal Constitution or federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

20.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because this action challenges a Tennessee law that applies to and purports to regulate the sale of AstraZeneca's products in this District. AstraZeneca makes its drugs available and offers its products to multiple 340B-covered entities within this District, and these entities maintain multiple contract pharmacy arrangements. The challenged law (if not invalidated) would apply to conduct and property in this District, including AstraZeneca's, and is highly likely to be enforced in this District.

21.      Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants maintain offices in this District, through which Defendants would enforce the law challenged in this action.

## PARTIES TO THE ACTION

22.      Plaintiff AstraZeneca Pharmaceuticals LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware. AstraZeneca is a biopharmaceutical company focusing on the discovery, development,

7

manufacturing, and commercialization of medicines. AstraZeneca participates in the 340B program.

23.    Defendant Jonathan Skrmetti is the Attorney General and Reporter of Tennessee. In that role, he enforces the challenged legislation. This suit is brought against him in his official capacity only. The Attorney General maintains an office in Nashville, Tennessee.

## FACTUAL ALLEGATIONS

### *The Federal 340B Program Caps Drug Prices for Enumerated Covered Entities that Provide Healthcare to Certain Underserved Populations*

24.    Section 340B of the Public Health Service Act established a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

25.    As a condition of receiving coverage and reimbursement for its drugs under Medicaid and Medicare Part B, a pharmaceutical manufacturer must enter into a pharmaceutical pricing agreement with HHS. 42 U.S.C. § 256b(a)(1). In that agreement, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at a specified discount price "if such drug is made available to any other purchaser at any price." *Id.* This is known as Section 340B's "must-offer" requirement. Manufacturers that "knowingly and intentionally charge[] a covered entity a price for purchase of a drug that exceeds the [340B discount price]" are subject to civil monetary penalties. *Id.* § 256b(d)(1)(B)(vi)(III). The 340B statute also regulates covered entities, which may not obtain 340B pricing on units of drugs for which a manufacturer pays a Medicaid rebate (known as "duplicate discounts"), nor resell or otherwise transfer such drugs to persons other than their patients (known as "diversion"). *Id.* § 256b(a)(5)(A), (B).

8

26.     Congress enacted Section 340B to give covered entities access to prescription drugs at below-market prices, thereby helping them serve their uninsured and indigent patients. H.R. Rep. No. 102-384, pt. 2, at 7 (1992). Balanced against its goal of increasing access, however, Congress also recognized the need to "assure the integrity of the drug price limitation program." *Id.* at 16.

27.     Congress has added to the list of 340B-covered entities over time, and today there are fifteen delineated categories of covered entities. 42 U.S.C. § 256b(a)(4)(A)-(*O*). Notably, that list does not include contract pharmacies.

28.     The 340B program has its own federal enforcement provisions and administrative dispute-resolution process. Congress required the Secretary of HHS to establish an adjudicatory body to resolve disputes among participants in the 340B program, including "claims by covered entities that they have been overcharged for drugs purchased under this section [340B], and claims by manufacturers … of violations" by covered entities. 42 U.S.C. § 256b(d)(3)(A). Under that statutory mandate, HRSA has established "requirements and procedures for the 340B Program's administrative dispute resolution (ADR) process." 85 Fed. Reg. at 80,632 (Dec. 14, 2020). The ADR Rule authorizes panels of federal officers to resolve claims for "monetary damages," as well as other unspecified "equitable relief" sought by claimants. 42 C.F.R. § 10.21(a). And it empowers ADR panels to address a range of factual and legal disputes, including "those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales." 85 Fed. Reg. at 80,636.

29.     Importantly, before a manufacturer may access the ADR process, HRSA requires the manufacturer to first audit a covered entity. *See* 42 U.S.C. § 256b(d)(3)(B)(iv); 89 Fed. Reg. 28,643, 28,645 (Apr. 19, 2024) ("[M]anufacturers are required to audit a covered entity prior to

filing an ADR claim"). And under HRSA regulations, a manufacturer may only initiate an audit when it can point to "documentation which indicates that there is reasonable cause," with "reasonable cause" defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on diversion or duplicate discounting. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). Thus, absent such "documentation," the ADR process is unavailable to a manufacturer.

30.     HRSA revised the ADR Rule last year. *See* 89 Fed. Reg. at 28,643. Among other things, the revised rule gives "340B ADR Panel[s]" responsibility to resolve disputes related to "overcharge[s]," which include claims that a manufacturer has "limited [a] covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling prices." 42 C.F.R. §§ 10.3, 10.21.

### Contract Pharmacy Use Leads to Abuse and Profiteering

31.     Section 340B does not require manufacturers to offer 340B-discounted drugs to contract pharmacies—or indeed, to *any* entity not specifically enumerated in the statute. In the decades since the enactment of the program, however, HRSA has issued two non-binding "guidance" documents purporting to authorize covered entities to enter into agreements with contract pharmacies to dispense outpatient drugs under Section 340B.

32.     In 1996, HRSA issued guidance providing that "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could now enter into an agreement with a *single* outside pharmacy of its choice to provide such services for 340B drugs. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance).

33.     Then, in 2010, HRSA released new guidance stating that covered entities could now "use multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies, without any geographic limits—"as long as they comply with guidance developed to help ensure

against diversion and duplicate discounts and the policies set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States.

34.     The 2010 Guidance triggered a massive surge in the number of contract pharmacies receiving and distributing 340B drugs. *See Novartis Pharms.*, 102 F.4th at 457 (noting a "significant expansion"). In 2018, the Government Accountability Office reported that the number of contract pharmacies had ballooned from 1,300 in 2010, to nearly 20,000 in 2017. U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 2 (June 2018) (2018 GAO Report), https://www.gao.gov/assets/700/692697.pdf. These numbers have continued to grow. Today, more than 33,000 different pharmacies participate in the 340B program, with more than 194,000 individual contracts. Adam J. Fein, Drug Channels Inst., *Exclusive: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market* (Jul. 11, 2023), https://www.drugchannels.net/2023/07/exclusive-for-2023-five-for-profit.html. The vast majority of these contract pharmacies (75% as of 2018) are for-profit retail chain pharmacies; and the five largest national pharmacy chains—CVS, Walgreens, Walmart, Rite-Aid, and Kroger—accounted for a combined 60% of all 340B contract pharmacies, even though these chains represent only 35% of all pharmacies nationwide. 2018 GAO Report at 20-21.

35.     Make no mistake, the boom in contract pharmacies has been fueled by the prospect of outsized profit margins on 340B-discounted drugs. As the D.C. Circuit explained:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other

words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Novartis Pharms.*, 102 F.4th at 457-58; *see* Decl. of Krista M. Pedley ¶¶ 5-9, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2. Since a 340B discount is applied for the contract pharmacy sale—even though the sale has *also* benefitted from the full insurance reimbursement—this dynamic results in substantial arbitrage revenues. *See Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023) ("[T]hey turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount."). And though the pharmacy may share some of its windfall with the covered entity (or the covered entity's vendor), *the patient* has still paid the full out-of-pocket amount designated under his or her insurance policy.

36.     As Senator Chuck Grassley put it in a letter to HRSA, for-profit pharmacies "are reaping sizeable 340B discounts on drugs and then turning around and upselling them to fully insured patients covered by Medicare, Medicaid, or private health insurance in order to maximize their spread." Letter from Sen. Chuck Grassley, S. Comm. on the Judiciary, to Mary K. Wakefield, Adm'r, HRSA (Mar. 27, 2013), https://www.grassley.senate.gov/download/2013-03-27-ceg-to-hrsa-340b-oversight-3. This "spread" means contract pharmacies retain up to $5 billion in annual profits from 340B sales. *See* Neal Masia, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019*, Alliance for Integrity & Reform (May 2021), http://bit.ly/4bM7sHE; Laura Joszt, *340B, Biosimilars, and More in the Future of Specialty Pharmacy*, Am. J. of Managed Care (May 4, 2022), https://bit.ly/4c61Do6 (five contract pharmacies "earn about $3.2 billion in

gross profits from 340B"); Walgreens Boots Alliance, Inc., Form 10-K (Oct. 15, 2020), https://bit.ly/3KveDrI (noting that "[c]hanges in pharmaceutical manufacturers' . . . distribution policies . . . in connection with the federal 340B drug pricing program[] could . . . significantly reduce [Walgreens's] profitability"); Rebecca Pifer, *Hospitals, PBMs Say Drugmaker Restrictions on 340B Discounts Stifling Finances*, HealthcareDive (May 5, 2020), https://bit.ly/3P9xmdF (reporting that CVS Health "said its 340B product lines were stagnant" after contract-pharmacy restrictions were imposed).

37.    Although some of the money generated through contract pharmacy sales is passed on to covered entities, most of these profits are *not* going to federally qualified health centers or other federal grantees that provide services to underserved populations (such as black lung clinics, hemophilia treatment centers, urban Indian health organizations, and AIDS drug purchasing assistance programs). Instead, they are being captured by 340B hospitals and contract pharmacies, which are responsible for nearly 90% of all 340B purchases. Aaron Vandervelde et al., Berkeley Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 7 (Oct. 2020), https://bit.ly/3owtUwa.

38.    Nor are these huge profits being passed on to patients. For example, in response to a 2018 GAO survey, 45% of covered entities admitted they do not pass along *any* discount to *any* patients that use *any* of their contract pharmacies. 2018 GAO Report at 30. As for the remaining 55%, the GAO noted that entities using contract pharmacies may provide discounts to patients only in limited cases. *Id*. Likewise, the HHS Office of Inspector General found in 2014 that some contract pharmacies do not offer 340B-discounted prices to uninsured patients at all. HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 2 (Feb. 4, 2014) (2014 OIG Report), https://oig.hhs.gov/oei/reports/oei-05-13-

00431.pdf. As a result, "uninsured patients pay the full non-340B price for their prescription drugs at contract pharmacies." *Id.* Indeed, some contract pharmacy arrangements expressly permit pharmacies to *deny* services to uninsured patients at certain pharmacy locations. By contrast, the GAO noted that 17 of 23 of the surveyed covered entities that had *in-house* pharmacies reported offering discounts at those pharmacies. 2018 GAO Report at 30 n.46. Most recently, a report by the Senate Committee on Health, Education, Labor & Pensions found that major covered entities do not directly pass on 340B discounts to patients, with one entity stating to the Committee that "reducing patients' drug expenses is not the purpose of the 340B Program." S. Comm. on Health, Educ., Labor & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 9 (Apr. 2025), https://www.help.senate.gov/imo/media/doc/final_340b_majority_staff_reportpdf.pdf.

39.     In short, the widespread proliferation of contract pharmacy arrangements since 2010 has transformed the 340B program from one intended to assist vulnerable patients into a multi-billion-dollar arbitrage scheme.

40.     At the same time, the explosive growth of contract pharmacy arrangements also has facilitated increased diversion and duplicate discounts. *See Novartis Pharms.*, 102 F.4th at 458. A 2011 report from the Government Accountability Office warned that "[o]perating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies." U.S. Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28, (Sept. 23, 2011), https://www.gao.gov/assets/330/323702.pdf. The report further found that "HRSA's oversight of the 340B program is inadequate because it primarily relies on participants' self-policing to ensure compliance." *Id.* at 21.

41.     These structural problems have only intensified over time, as the use of multiple contract pharmacies has become rampant. The 2014 OIG report determined that self-policing by covered entities has been insufficient to stop these abuses, since "most covered entities . . . do not conduct all of the oversight activities recommended by HRSA." 2014 OIG Report at 2. The 2018 GAO Report similarly criticized the continuing "weaknesses in HRSA's oversight [that] impede its ability to ensure compliance with 340B Program requirements at contract pharmacies." 2018 GAO Report at 45.

42.     Indeed, HRSA's own audits of covered entities continue to identify numerous instances of abuse. The 2018 GAO Report observed that "66 percent of the 380 diversion findings in HRSA audits [between 2012 and 2017] involved drugs distributed at contract pharmacies." *Id.* at 44. And based on information from HRSA's website, over 25% of covered entities audited since 2017 have had at least one finding related to contract pharmacy noncompliance. Indeed, out of 199 audits conducted in 2019, HRSA discovered dozens of instances of duplicate discounts, as well as evidence that at least 19 covered entities had permitted diversion of 340B drugs through contract pharmacies. *See* HRSA, *Program Integrity: FY19 Audit Results*, https://www.hrsa.gov/opa /program-integrity/audit-results/fy-19-results.

### *AstraZeneca's 340B Policy and Resulting Litigation*

43.     Against this legal and factual backdrop, in August 2020, AstraZeneca announced to covered entities that, effective October 1, 2020, it would revert to the contract pharmacy approach set forth in HRSA's 1996 Guidance.

44.     Under this policy, AstraZeneca continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities. For covered entities that do not maintain their own on-site dispensing pharmacy, AstraZeneca offers discounted drugs for sales at

a single contract pharmacy site for each covered entity. But AstraZeneca no longer makes 340B discounts available for drugs sold at an unlimited number of contract pharmacies.

45.     AstraZeneca's policy is consistent with the letter and intent of the 340B program—limiting the potential for abuse, while still enabling all covered entities and their patients to continue to access AstraZeneca's medicines at 340B prices. Under AstraZeneca's policy, over 13,000 covered entities that lack an on-site pharmacy have registered a contract pharmacy to which AstraZeneca continues to make 340B discounts available, including numerous covered entities in Tennessee. AstraZeneca is committed to working with all covered entities to ensure that every patient can obtain needed medicines at prices they can afford.

46.     In response to AstraZeneca's new contract pharmacy policy and other manufacturers' adoption of similar policies, HHS and HRSA issued an Advisory Opinion on December 30, 2020, asserting that the 340B statute requires manufacturers to offer 340B-discounted drugs for sales at unlimited contract pharmacies.

47.     In 2021, AstraZeneca filed suit in the U.S. District Court for the District of Delaware against HHS and HRSA, challenging the Advisory Opinion. On June 16, 2021, the Delaware court issued a detailed opinion finding the Advisory Opinion unlawful. *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021). The court concluded that Section 340B "says nothing about the permissible role (if any) of contract pharmacies," and that, in light of this "total omission," the Advisory Opinion's attempt to impose an obligation on AstraZeneca to make discounted drugs available for sales at unlimited contract pharmacies was "legally flawed." *Id.* at 59. The agency withdrew the Advisory Opinion following the Delaware court's ruling.

48.     In a second ruling, the Delaware court addressed AstraZeneca's challenge to a "violation letter" issued by HRSA, which adopted the same position as the Advisory Opinion. The

court again rejected the agency's view that Section 340B obligates drug manufacturers to make 340B-discounted drugs available for unlimited contract pharmacy sales. *AstraZeneca Pharms. LP v. Becerra*, No. 21-cv-27, 2022 WL 484587 (D. Del. Feb. 16, 2022). The court reiterated "key points" from its prior opinion, including that Congress "did not clearly intend for drug manufacturers to be required to facilitate sales of covered drugs for dispensing by an unlimited number of contract pharmacies." *Id.* at *5-*6.

49.     On January 30, 2023, the U.S. Court of Appeals for the Third Circuit affirmed the Delaware court's rulings. In a consolidated opinion addressing AstraZeneca's case and appeals in parallel actions by other manufacturers, the Third Circuit held that the Advisory Opinion and violation letter are "unlawful," and it "enjoin[ed] HHS from enforcing [it] against" AstraZeneca. *Sanofi*, 58 F.4th at 706. The court of appeals also held that AstraZeneca's policy of not offering discounts for sales at unlimited contract pharmacies "do[es] not violate Section 340B." *Id.*

50.     On October 1, 2024, AstraZeneca updated its contract pharmacy policy to require covered entities to report a limited set of claims data for contract pharmacy dispenses that were replenished using 340B-priced drugs.

51.     AstraZeneca's collection of limited 340B claims data enables AstraZeneca to detect and prevent violations of the 340B statute's program integrity provisions, including its prohibition on duplicate discounts. A duplicate discount occurs when a manufacturer pays a separate rebate to a payer for a drug that was purchased, credited, or replenished at the 340B price. The 340B statute expressly prohibits duplicate discounts between the 340B and Medicaid. *See* 42 U.S.C. § 256b(a)(5)(A).

52.     Other types of duplicate discounts are prohibited under payer-manufacturer contracts or other federal laws. For instance, the Inflation Reduction Act requires HHS to

"negotiate" with manufacturers for a "maximum fair price" that Medicare will pay for certain drugs, which must include a discount of at least 20%. *Id.* § 1320f-3(a). Under the IRA, each manufacturer must make its drug available at the "maximum fair price"—but *not* if the drug is available at a lower 340B price. *Id.* § 1320f-2(d). To ensure compliance with the IRA and prevent duplicative price reductions under Section 340B and the IRA, the Centers for Medicare and Medicaid Services (CMS) has charged manufacturers with identifying instances where a drug has been dispensed as a 340B drug. *See* CMS, Medicare Drug Pricing Negotiation Final Guidance 58-60 (Oct. 2, 2024), https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

53.     Without access to claims data, however, AstraZeneca lacks sufficient information to adequately identify and prevent these—and other—duplicate discounts. The information AstraZeneca needs to directly connect payer rebates to 340B dispenses is *not* otherwise available to AstraZeneca as part of the 340B purchasing process. And requests by manufacturers for participants in the system (including covered entities and contract pharmacies) to provide the necessary information on a voluntary basis have been consistently spurned by the entities, pharmacies, and HRSA.

54.     As a manufacturer participating in the 340B program, AstraZeneca has a statutory right to conduct audits of covered entities regarding compliance with the statute's anti-duplication requirement, and it may compel the reporting of some data in connection with those audits. 42 U.S.C. § 256b(a)(5)(C). But HRSA regulations provide that a manufacturer may only initiate an audit when it can furnish "documentation which indicates that there is reasonable cause" for such an audit, with "reasonable cause" defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibitions on diversion or duplicate discounting. 61 Fed.

Reg. at 65,409. As a result, a manufacturer must already have "documentation" showing that a covered entity has engaged in duplicate discounting before it may obtain permission to audit that entity.

55.     Covered entities generally do not voluntarily provide manufacturers with the information or data required to establish "reasonable cause." And without the ability to establish reasonable cause, HRSA will not permit AstraZeneca to access its audit rights.

56.     Given these challenges, AstraZeneca's contract pharmacy policy requires covered entities to submit limited claims data for 340B purchases and dispenses at contract pharmacies. The data that AstraZeneca requires covered entities to submit was already required of pharmacies when they submit claims to payers; and HRSA requires covered entities to maintain the same data in the regular course of business, with one minor exception for the unique identification number of the covered entity.

57.     In *Novartis Pharmaceuticals*, the D.C. Circuit upheld a manufacturer claims data policy that was materially identical to AstraZeneca's current policy. 102 F.4th at 464. Among other things, the court explained that the request for information was consistent with HRSA guidance, under which "drug manufacturers may require [such] 'standard information' from covered entities." *Id.* at 463 (quoting 59 Fed. Reg. 25,114). The Court also emphasized that "record evidence" showed "the burden of providing the claims data is 'minimal.'" *Id.*

### Tennessee Enacts Legislation Requiring Manufacturers to Make 340B-Discounted Drugs Available for Unlimited Contract Pharmacy Sales

58.     On April 22, 2025, the Tennessee Legislature passed SB 1414, which Governor Bill Lee signed into law on May 5, 2025.

59.     Because the Legislature declared that the "public welfare requir[es] it," the law took effect immediately upon signing by the Governor. SB 1414 § 4.

60.     SB 1414 provides that a drug manufacturer "shall not, either directly or indirectly, deny, impose any restrictions or prohibitions on, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity unless such receipt is prohibited by the United States department of health and human services or applicable state law." *Id.* § 1(c).

61.     SB 1414 defines its basic terms by reference to federal law. It defines "340B drug" to mean "a covered outpatient drug within the meaning of 42 U.S.C. § 256b" that "is eligible for any offer for reduced prices by a manufacturer under 42 U.S.C. § 256b(a)(1)" and "is purchased by a 340B entity or would have been purchased by a 340B entity but for a restriction or limitation described in" Tennessee Code § 56-7-3119(b). SB § 1(g)(1). SB 1414 also defines "340B entity" to mean "a covered entity participating in the federal 340B drug discount program, as defined in section 340B of the Public Health Service Act, 42 U.S.C. § 256b, including the entity's pharmacy or pharmacies." *Id.* § 1(g)(2).

62.     SB 1414 also restricts manufacturers' ability to collect data regarding the purchase and dispensing of 340B drugs by covered entities and contract pharmacies. The statute provides that drug manufacturers may not "requir[e] the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law." *Id.* § 1(a)(1). SB 1414 does not acknowledge that collecting such claims data is a critical means for manufacturers to develop the "reasonable cause" that HRSA guidance requires before a manufacturer may audit a covered entity, 61 Fed. Reg. at 65,409, and is also

necessary to identify sales that are eligible for the Medicare Drug Price Negotiation Program under the Inflation Reduction Act (IRA), s*ee* 42 U.S.C. § 1320f-2(d), in order to avoid duplicate discounts under both the 340B program and the IRA.

63. In addition, SB 1414 also restricts manufacturers from "[r]equir[ing] a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program." SB 1414 § 1(a)(2). By preventing manufacturers from even *asking* covered entities to "clarify" a claim, SB 1414 further impedes manufacturers' access to the ADR system that federal law provides for manufacturers to seek relief from covered entity noncompliance.

64. SB 1414 also specifies additional prohibited actions with respect to the 340B program, barring manufacturers from "either directly or indirectly" "impos[ing]" certain types of "requirements" on 340B entities, including: "any requirements relating to inventory management systems of 340B drugs"; "any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities"; "requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities"; and, most sweepingly (and vaguely), "any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program." *Id.* § 1(a)(3)-(6).

65. These prohibitions substantially impair a manufacturer's ability to participate in and comply with the 340B program. For example, SB 1414 bars manufacturers from imposing "any requirements relating to inventory management systems of 340B drugs." *Id.* § 1(a)(3). But inventory management is critical to ensuring that covered entities do not obtain duplicate discounts or engage in diversion, both of which are forbidden by Section 340B. As the D.C. Circuit

explained, manufacturers routinely prevent these statutory violations by requiring claims data from covered entities, a requirement that is consistent with "historical practice" and imposes a "burden" on covered entities that is only "minimal." *Novartis Pharma.*, 102 F.4th at 463-64 (quotation marks omitted). SB 1414 directly interferes with that safeguard. Similarly, SB 1414 prohibits drug manufacturers from "[i]mpos[ing] any requirement related to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities." *Id.* § 1(a)(4). Yet a key mechanism for preventing abuse under 340B program is the robust statutory audit mechanism, *see supra* ¶¶ 29, 54; *see also* 42 U.S.C. § 256b(a)(5)(C). This mechanism is strictly regulated, requiring prior HRSA approval prior before a manufacturer may conduct an audit, the scope of which must be defined by HRSA. 61 Fed. Reg. 65406, 65410 (Dec. 12, 1996). SB 1414 thus directly interferes with a manufacturer's statutory right to request and conduct audits under agency approval.

66.     Although one subsection of SB 1414, subsection (c), purportedly "does not apply to any requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025," *id.* § 1(c), this temporal-limitation clause only applies to subsection (c). The law's other restrictions, such as the extensive restrictions in subsection (a), do not contain a similar carveout.

67.     SB 1414's sweeping prohibitions also contain no geographic limitations. *See* SB 1414 § 1(g) (defining "340B entity" as "a covered entity participating in the federal 340B drug discount program").

68.     SB 1414 does not prohibit diversion or otherwise require that drugs purchased at 340B-discounted prices be dispensed only to patients of a covered entity. *See* 42 U.S.C. § 256b(a)(5)(B) ("[A] covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."). Nor does SB 1414 account for HRSA's enforcement authority or

for the congressionally mandated procedures for administrative dispute resolution. *See id.* § 256b(d)(3).

69.     A violation of SB 1414 is punishable by a $50,000 fine. SB 1414 § 1(d)(1). The legislation provides that "[e]ach package of 340B drugs applicable to a violation of subsection (a) or (c)" of the bill "constitutes a separate violation." *See id.* § 1(d)(2). Violations of SB 1414 are also deemed violations of the Tennessee Consumer Protection Act, which includes criminal penalties. *See id.* § 2; Tenn. Code Ann. § 47-18-104(a) (classifying violations of the Tennessee Consumer Protection Act as "Class B misdemeanors").

70.     The Tennessee Attorney General is empowered to enforce violations of the Consumer Protection Act. *See* Tenn. Code Ann. § 47-18-106. Additionally, by incorporating the Consumer Protection Act, SB 1414 also authorizes a private right of action for individual enforcement. *See* § 47-18-109(a)(1).

***A Federal District Court Rules That Certain of SB 1414's Provisions Are Not Preempted***

71.     Shortly after SB 1414 took effect, AbbVie Inc. filed suit to challenge the new law. *See AbbVie Inc. v. Skrmetti*, No. 25-cv-519, 2025 WL 1805271, at *1 (M.D. Tenn. June 30, 2025). Arguing that SB 1414 violates the Supremacy Clause, the Takings Clause, the Commerce Clause, and the Due Process Clause of the U.S. Constitution, AbbVie asked the Court to preliminary enjoin Tennessee officials from enforcing the statute.

72.     On June 30, 2025, the Court denied AbbVie's motion for a preliminary injunction. *AbbVie*, 2025 WL 1805271, at *2. Relevant here, the Court first concluded that AbbVie lacked standing to bring a pre-enforcement challenge to subsection 1(c) of the act—the provision that requires pharmaceutical manufacturers to make their products available to an unlimited number of contract pharmacies. *Id.* at *7-11. In reaching this result, the Court explained that subsection 1(c) contains a "grandfather clause" that "specifically exempts the application of that subsection to

'requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025.'" *Id.* at *9 (quoting SB 1414 § 1(c)). That was critical, the Court explained, because AbbVie—like AstraZeneca—had enacted a policy prior to June 1, 2025, pursuant to which it would "no longer indiscriminately accept requests to transfer or otherwise ship 340B discounted drugs to an unlimited number of contract pharmacies," and would instead "continue to offer" any covered entity "the ability to purchase drugs" at 340B-discounted prices either through the covered entity's in-house pharmacy or to "one contract pharmacy location" for covered entities without an in-house pharmacy. *Id.* at *7, *9 (citations omitted). Because AbbVie had not "significantly changed" its contract pharmacy policy since April 2023, the Court held that AbbVie's policy fell within the scope of the grandfather clause. *Id.* at *9. The Court therefore concluded that AbbVie had not established a "credible threat of imminent enforcement of S.B. 1414 § 1(c) against it." *Id.* at *9.

73.     The Court reached a different result, however, regarding the remainder of the statute, including the claims data restrictions found in subsection 1(a). Unlike subsection 1(c), subsection 1(a) does not contain a "grandfather clause." *Id.* at *10. Thus, to the extent that AbbVie's contract pharmacy policy—like AstraZeneca's—requires covered entities to submit "limited claims data on 340B utilization," *id.* at *7, the Court found that AbbVie's policy was "clearly implicated" by SB 1414 and that AbbVie had established a credible threat of the "statute's enforcement against it." *Id.* at *10 (cleaned up).

74.     Although it found that AbbVie had standing to challenge subsection 1(a), the Court ultimately concluded that AbbVie was unlikely to succeed on the merits of its claim that subsection 1(a) is preempted by federal law. *Id.* at *13-19. AstraZeneca respectfully submits that, for the reasons discussed in more detail below, that decision rested on incorrect premises.

## LEGAL ALLEGATIONS

### *SB 1414 Is Preempted by Section 340B*

75.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Wayside Church v. Van Buren County*, 847 F.3d 812, 820 (6th Cir. 2017) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)), *abrogated in part on other grounds by Knick v. Township of Scott*, 588 U.S. 180, 206 (2019)).

76.    Due to SB 1414 § 1(c)'s grandfather clause, manufacturers like AstraZeneca are exempt from the provisions of the statute that compel manufacturers to make 340B discounts available for unlimited contract pharmacy sales, *see AbbVie*, 2025 WL 1805271, at *9. Nevertheless, the remaining provisions of the law "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.*, 776 F.3d 411, 424 (6th Cir. 2015) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000)).

77.    States are prohibited from establishing parallel regulatory regimes that encroach on the federal government's authority to set and define federal enforcement priorities. *See Buckman*, 531 U.S. at 349-51. Yet SB 1414 does just that, directly interfering with the robust federal enforcement regime that Congress has enacted for the 340B program, which includes the ADR process, required auditing provisions for manufacturers and covered entities, and the possibility of civil monetary penalties in the event of a manufacturer overcharge or diversion by a covered entity.

78.     Indeed, SB 1414 expressly prevents manufacturers from using the federal enforcement regime. "[M]anufacturers are required to audit a covered entity prior to filing an ADR claim," 89 Fed. Reg. at 28,645; *see* 42 U.S.C. § 256b(d)(3)(B)(iv), and a manufacturer must have "documentation" indicating diversion or duplicate discounts before it may initiate such an audit, 61 Fed. Reg. at 65,409. But SB 1414 makes it a crime for manufacturers to require covered entities to submit any "claims or utilization data, purchasing data, payment data, or other data." SB 1414 § 1(a)(1). "By restricting the very method by which data collection is made," SB 1414 "frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the alternative dispute resolution system." *PhRMA v. Morrisey*, 760 F.Supp.3d 439, 453 (S.D. W. Va. 2024).

79.     AstraZeneca respectfully submits that the *AbbVie* Court's conclusion to the contrary misunderstands aspects of the law governing the ADR process and how claims data collection works in practice. *See* 2025 WL 1805271, at *14-17. For instance, the Court suggested that SB 1414 does not interfere with manufacturers' ability to access claims data because the statute does not prevent manufactures from "asking" covered entities for that data. *Id.* at *15-16. As explained above, however, covered entities rarely—if ever—voluntarily provide manufacturers with claims data. And in the likely event that a covered entity were to deny such a request, SB 1414 provides manufacturers with no recourse. *See PhRMA*, 760 F.Supp.3d at 453 (explaining the same in context of materially similar statute).

80.     Relatedly, it is far from clear that a manufacturer's "good faith request" for claims data, standing alone, would entitle a manufacturer to access the 340B statute's alternative dispute resolution mechanism. *Contra AbbVie*, 2025 WL 1805271, at *16. As a result, a manufacturer's inability to obtain such claims data means that Tennessee's law substantially restricts a

manufacturer's ability to access the ADR mechanism—and hence its ability, consistent with its statutory rights, to recover for improper diversion or duplicate discounting.

81.     The data-collection restriction conflicts with federal law in other ways, too. Under the Inflation Reduction Act, Congress has instructed HHS to "negotiate" with manufacturers regarding the "maximum fair price" that Medicare will pay for certain drugs. 42 U.S.C. § 1320f-3(a). A manufacturer whose drug is selected for "negotiation" must make the drug available at the "maximum fair price" unless it is available at a lower 340B price. *Id.* § 1320f-2(d). To ensure compliance with the IRA and to prevent duplicate price reductions, the Centers for Medicare and Medicaid Services ("CMS") has charged manufacturers with identifying instances where a drug has been dispensed as a 340B drug. *See* CMS, Medicare Drug Pricing Negotiation Final Guidance 58-60 (Oct. 2, 2024), https://www.cms.gov/files/document/medicare-drug-price-negotiation-final-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf. But SB 1414 bars manufacturers from obtaining the data that manufacturers need to make those identifications. Indeed, it bars manufacturers even from *asking* covered entities to "clarify" claims after they are submitted. SB 1414 § 1(a)(2). Tennessee's law therefore prevents manufacturers from avoiding unlawful duplicate discounts, conflicting with federal law. *See* 42 U.S.C. § 1320f-2(d) (providing that manufacturers "shall not be required" to provide duplicate discounts).

82.     Indeed, recognizing that manufacturers who lack claims data run a significant risk of paying duplicate discounts, HRSA recently proposed a pilot program under which manufacturers may first receive sales "data" from covered entities before paying 340B rebates. *See* 90 Fed. Reg. 38,165 (Aug. 7, 2025). As HRSA explained, obtaining such "data submission" helps manufacturers "address 340B and Maximum Fair Price (MFP) deduplication" under the IRA, and it also "facilitate[s] . . . the prevention of 340B Medicaid duplicate discounts and diversion." *Id.* at

38,165. The data identified as appropriate for manufacturers to receive under the pilot program is precisely the same "readily available pharmacy claim" data required by AstraZeneca's policy—but that SB 1414 forbids manufacturers to request. *See id.* at 38,167. SB 1414 thus precludes manufacturers like AstraZeneca from participating in the pilot program, because it forbids them from collecting the very same data that the pilot program contemplates.

83.     In addition, the *AbbVie* Court did not address the conflict between other provisions of SB 1414 and Section 340B. Subsection 1(a)(3) prohibits manufacturers from imposing even reasonable requirements related to inventory management. *See AbbVie*, 2025 WL 1805271, at *13-19. Yet it is a "historic practice[] under the 340B program" for manufacturers to require claims data and other inventory-management practices as a condition on their "offer" of 340B-priced drugs to covered entities. *Novartis*, 102 F.4th at 464. "[T]he burden of providing the claims data is 'minimal,'" *id.* at 463, and the data is necessary "to police diversion and duplicate discounts," *id.* at 458, which the 340B statute prohibits. *See* 42 U.S.C. § 256b(a)(5)(A), (B). By forbidding manufacturers from continuing to require such data as a condition of their 340B "offer," SB 1414 interferes with the proper functioning of the 340B program.

84.     SB 1414 also directly conflicts with the 340B program's audit regime. It bars manufacturers from imposing requirements related to "the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities." SB 1414 § 1(a)(4). Yet the 340B statute expressly grants manufacturers a right to audit covered entities, 42 U.S.C. § 256b(a)(5)(C), and HRSA has promulgated extensive rules and guidelines governing the audit process, *see, e.g.*, 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). HRSA's guidelines specify the number, scope, and duration of permissible audits, as well as the procedures and processes to be used. *Id.* at 65,409–11. Importantly, HRSA itself must review and approve any requested audits.

*Id.* at 65,406. The decision whether to allow an audit, and the scope of any such audit, is accordingly a matter entrusted to the agency and governed solely by federal law. SB 1414 interposes the State of Tennessee into this exclusively federal regime and interferes with manufacturers' statutorily granted audit rights.

85.     In *Astra USA, Inc. v. Santa Clara County*, the Supreme Court held that private entities may not bring actions under state contract law to enforce the provisions of manufacturers' 340B pharmaceutical pricing agreements. 563 U.S. at 113-14. "Congress made HHS administrator of … the 340B Program." *Id.* at 120. Suits by private entities, the Court explained, "would undermine the agency's efforts" to administer the program "harmoniously and on a uniform, nationwide basis." *Id.* "With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial." *Id.*

86.     By inserting Tennessee and its officials into the program that Congress adopted, SB 1414 frustrates the accomplishment of Congress's objectives and interferes with Congress's chosen method of oversight.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**(Declaratory/Injunctive Relief – SB 1414 is Preempted by Section 340B
Supremacy Clause, U.S. Const. art. VI, cl. 2)**

87.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

88.     The Supremacy Clause, U.S. Const. art. VI, cl. 2, prohibits a State from enacting any law "which interferes with or is contrary to federal law," *Wayside Church*, 847 F.3d at 820 (quoting *Felder*, 487 U.S. at 138). The mandates imposed on drug manufacturers by SB 1414, and

its associated enforcement mechanisms, are preempted by the 340B statute under the Supremacy Clause.

89.     SB 1414 creates an obstacle to the accomplishment and execution of Congress's objectives for the 340B statute. Federal law establishes a comprehensive regime for enforcement and management of the program, which includes the ADR process, audits, and civil monetary penalties. SB 1414 interferes with a manufacture's ability to access and make use of those federal enforcement provisions. SB 1414's attempt to insert into Congress's program a layer of enforcement by state officials under Tennessee law frustrates Congress's purposes and interferes with the carefully specified federal regime it created.

90.     For these reasons, SB 1414's provisions barring a manufacturer from obtaining claims data from covered entities and pharmacies, from imposing reasonable requirements related to inventory management, and from exercising its federal audit rights, and SB 1414's provisions empowering Defendants to pursue purported violations of the statute, are preempted by federal law under the Supremacy Clause.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** AstraZeneca requests a judgment in its favor against the Tennessee Attorney General as follows:

A.     Declare that SB 1414 is preempted by Section 340B and is therefore null, void, and unenforceable under the Supremacy Clause of the U.S. Constitution;

B.     Declare that AstraZeneca is not restricted under Tennessee law in its ability to request and collect data from covered entities and contract pharmacies, to impose reasonable requirements related to inventory management, and to exercise its federal audit rights;

C.   Issue preliminary and permanent injunctive relief preventing Defendants from implementing or enforcing SB 1414 against AstraZeneca or any of its affiliates, officers, agents, or contractors;

D.   Issue preliminary and permanent injunctive relief preventing Defendants from seeking civil penalties, equitable relief, or any other remedy based on any alleged violation of SB 1414 by AstraZeneca or any of its affiliates, officers, agents, or contractors;

E.   Award AstraZeneca reasonable attorneys' fees and costs, as appropriate; and

F.   Grant such other and further relief as the Court may deem appropriate.

August 29, 2025                    Respectfully submitted,


                                   */s/Clarence A. Wilbon*
                                   Clarence A. Wilbon (BPR No. 023378)
                                   ADAMS & REESE
                                   6075 Poplar Ave. Suite 700
                                   Memphis, TN  38119
                                   Phone: 901-524-5284
                                   Fax:    901-524-5384
                                   Email: clarence.wilbon@arlaw.com

                                      — *and* —

                                   Allon Kedem*
                                   Jeffrey L. Handwerker*
                                   Stephen K. Wirth*
                                   Samuel I. Ferenc*
                                   ARNOLD & PORTER KAYE SCHOLER LLP
                                   601 Massachusetts Ave., NW
                                   Washington, DC 20001-3743
                                   (202) 942-5000
                                   (202) 942-5999 - fax
                                   allon.kedem@arnoldporter.com
                                   jeffrey.handwerker@arnoldporter.com
                                   stephen.wirth@arnoldporter.com
                                   sam.ferenc@arnoldporter.com

                                   Carmela T. Romeo*
                                   ARNOLD & PORTER KAYE SCHOLER LLP
                                   250 West 55th Street
                                   New York, NY 10019-9710
                                   (212) 836-8000
                                   (212) 836-8689 fax
                                   carmela.romeo@arnoldporter.com

                                   * *Applications to be admitted pro hac vice forthcoming*